# No. 23-70004

# In the United States Court of Appeals for the Fifth Circuit

MICAH CROFFORD BROWN,

*Petitioner-Appellant,*

v.

BOBBY LUMPKIN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Texas,
USDC No. 3:19-CV-2301

———————

## MOTION FOR RECONSIDERATION

———————

MAUREEN FRANCO
Federal Public Defender
Western District of Texas

TIVON SCHARDL
Chief, Capital Habeas Unit
BENJAMIN HUMPHREYS MCGEE, III
Assistant Federal Public Defender
919 Congress Ave., Suite 950
Austin, Texas 78701
737-207-3020 (telephone)
Humphreys_McGee@fd.org

**CAPITAL CASE**

# TABLE OF CONTENTS

Table of Contents ........................................................... i

Table of Authorities ......................................................... ii

Introduction ............................................................. 1

Reasons for Granting Reconsideration ....................................... 2

I.    Trial counsel never gave any effect to the mitigation specialist's recommendations ........................................ 3

II.   The Court overlooks undisputed evidence that counsel knew enough about Brown's psychological history to require consultation with an expert. ........................................ 6

Conclusion ............................................................. 12

Certificates of Service and Compliance with ECF Filing Standards ..... 13

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Typle Style Requirements ........................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Johnson,*
   338 F.3d 382 (5th Cir. 2003)........................................................ 7, 10

*Hinton v. Alabama,*
   571 U.S. 263 (2014)........................................................................ 2

*Rompilla v. Beard,*
   545 U.S. 374 (2005)........................................................................ 5, 7

*Sears v. Upton,*
   561 U.S. 945 (2010)........................................................................ 5

*Strickland v. Washington,*
   466 U.S. 668 (1984)........................................................................ 1

*Wiggins v. Smith,*
   539 U.S. 510 (2003)........................................................................ 7, 11

# INTRODUCTION

In his motion for a certificate of appealability (COA), Brown argued that it is at the very least debatable among reasonable jurists whether his trial counsel were ineffective at the guilt-innocence stage in failing to investigate and present evidence that he has Autism Spectrum Disorder (ASD). *See* Claim 1.C.3 of Brown's federal habeas petition (ROA 202-06)[1]. In denying Brown's motion for COA, the Court overlooked vital evidentiary support for this claim. That evidence shows that trial counsel committed the classic *Strickland* violation of failing to perform an adequate investigation into their client's psychological history. *Strickland v. Washington*, 466 U.S. 668 (1984). Indeed, the Court appears to have misapprehended the gravamen of this claim, which is counsel's failure to present evidence of ASD resulted primarily from their unreasonable refusal to hire a psychological expert to evaluate their client. Brown respectfully requests that the Court re-evaluate the record with that legal framework in mind—i.e., that counsel were ineffective in failing to obtain an evaluation that would have discovered ASD.

---

[1] Brown incorporates by this reference the allegations and argument he makes in Claim 1.C.3 of his federal habeas petition (ROA 202-06) and throughout his motion for COA (ECF 32).

## REASONS FOR GRANTING RECONSIDERATION

"'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (citation omitted). This is one of those cases.

In denying a COA on Claim 1, the Court dismisses mitigation specialist Maureen Griffin's belief that Brown could have Asperger's Syndrome because her "affidavit does not state that she relayed these specific concerns to trial counsel." ECF 53-1 at 6-7. In isolating that fact from all the other evidence regarding the information she gave to defense counsel, the Court misapprehends how Griffin's written correspondence with defense counsel support Brown's claim that the failure to discover and present evidence of ASD resulted primarily from counsel's unreasonable disregard for seeking psychological expert assistance. The Court likewise overlooks a substantial body of evidence that defense counsel knew about Brown's history of serious mental illness—evidence that, under the Supreme Court's caselaw governing ineffectiveness in representing capital defendants, left no reasonable avenue other than to seek the expert assistance that would have discovered Brown's ASD.

## I. Trial counsel never gave any effect to the mitigation specialist's recommendations.

In focusing solely on "[the] alleged conversation between the mitigation specialist and trial counsel" about ASD, ECF 53-1 at 7, the Court overlooks the record of written correspondence between Griffin and trial counsel regarding Brown's mental health. That correspondence shows trial counsel essentially ignored Griffin's efforts to build a psychologically probative case for their client, prompting Griffin to send notice that she was withdrawing from the case. ROA 17033-34.[2] In that resignation letter, Griffin details a litany of emails, phone calls, and meetings about developing a mitigation case, all of which trial counsel ignored. *Id*. When Griffin's desire to withdraw from the case finally got the attention of one of Brown's attorneys, second-chair counsel Katherine Ferguson, she did not contest that there had been a lack of communication. To the contrary, Ferguson effectively confirmed it, responding to Griffin that "[m]y problem has been getting communication with [lead counsel] Toby [Wilkinson] and [fact investigator] James [Smith]." ROA 17030.

---

[2] Griffin's resignation letter is part of Petitioner's Exhibit 21 in state habeas proceedings.

Trial counsel persuaded Griffin to stay on the case, but their disregard for her work continued. ROA 19114-15. Griffin's affidavit attests that she recommended to trial counsel "that Micah be examined for mental health and neuropsychological issues[,]" a suggestion that trial counsel ignored. ROA.19116. In an email to Ferguson detailing some of Brown's fraught psychological history, Griffin asked, "Do you have a shrink other than [Dr. Paula Lundberg-Love, a psychopharmacologist]? I'm thinking someone who can pitch his childhood and put his reactions toward [his ex-wife, the victim] into perspective." ROA 17024. Three months later, she wrote counsel to say that if Dr. Mark Cunningham, the defense's expert on future dangerousness, was not going to address "the psych component of Micah," then she would "suggest you see if [Dr. Cunningham] will or find someone who will. So many facets of [Brown's] personality to explore." ROA 17022. And in an email that Griffin read into the record at the state habeas hearing, Griffin expressed concerns to Brown's trial counsel "if he doesn't show emotion at the photos, alive and dead, he'll be perceived as cold-blooded[.]" ROA 16352 (testimony), 18840 (email). She noted that she had "touched on some painful subjects with Micah and his affect was always pretty flat[,]" and asked, "Do we have a

plan if he continues to be blank and it's not being perceived as helpful? Maybe a psych?" *Id.*

The answer to Griffin's question, of course, was no: they did not have a plan. Not having a plan—that is, not having a strategy—to help the jury understand Brown's flat affect was the result of not having investigated the psychological source of that characteristic. Griffin's emails to Brown's defense counsel were precisely the type of "'red flags' pointing up a need to test further." *Rompilla v. Beard,* 545 U.S. 374, 391 (2005). "Further effort would presumably have unearthed much of the material postconviction counsel found," *id.*, namely a diagnosis of ASD. "This evidence might not have made [Brown] any more likable to the jury, but it might well have helped the jury understand [Brown], and his horrendous acts[.]" *Sears v. Upton*, 561 U.S. 945, 951 (2010). It might have helped them understand the flat demeanor that Griffin was worried about.

This Court overlooked the body of evidence supporting this claim, therefore, when it concluded that except for an "alleged conversation between the mitigation specialist and state trial counsel, insufficient evidence exists for us to conclude that reasonable jurists would debate

whether trial counsel fell below the Strickland standard in investigating whether Brown had ASD." ECF 53-1 at 7. Griffin's written correspondence shows there is much more than a single alleged conversation supporting a claim of *Strickland* ineffectiveness here.

## II. The Court overlooks undisputed evidence that counsel knew enough about Brown's psychological history to require consultation with an expert.

In its denial of a COA on this claim, the Court relied on trial counsel's self-vindicating testimony that "none of the eighty-plus people the defense team spoke with, including Brown, his family, and friends, ever noted any history of psychological issues, which would have prompted counsel to investigate further, nor did they observe any behavior that made them believe he may have had a mental health disorder." ECF 53-1 at 7. In focusing solely on this aspect of counsel's performance, the Court overlooks the uncontestable fact that Brown's lead counsel knew about substantial evidence of his client's serious mental health problems before trial. The lay opinions of Brown's family, friends, and lawyers about his psychological condition cannot be dispositive in a *Strickland* inquiry when his lawyers had significant evidence to the contrary.

"In assessing the reasonableness of an attorney's investigation … a court *must* consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (emphasis added). Failing to conduct further investigation in Brown's case, given everything counsel have acknowledged they knew, cannot be described as a reasonable exercise of professional judgment or as "part of a calculated trial strategy[.]" *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (internal quotation marks and citation omitted). Instead, it is "likely the result of either indolence or incompetence." *Id.*

First, as discussed in detail above, the defense team's mitigation specialist observed behavior, such as Brown's flat affect, that made her believe that psychological testing was in order. Insofar as she recorded and communicated those observations to defense counsel who hired her to assist in building a case, they were in possession of her recommendations and are charged with knowing what she recommended, whether they actually read her emails and memoranda or not.

Second, even assuming trial counsel never observed any behavior that alerted them to the possibility of psychological impairment in their

client, they had plenty of red flags waved in front of them, all "pointing up *a need to test further*." *Rompilla*, 545 U.S. at 391 (emphasis added). On November 28, 2012, over four months before jury selection began, Griffin presented defense counsel with a written summary of Brown's history of serious mental health problems: he had been hospitalized for addiction twice; he had been diagnosed by a doctor with "major depression (recurring/severe w/o psychotic)[;]" and he had attempted suicide by overdose, for which he was hospitalized for several days. ROA 16645-46.

These red flags were everywhere, indicating to any reasonably competent lawyer that Brown needed to be evaluated by an expert to assist his defense team in making informed decisions about his case. Indeed, this Court's own summary of the mitigation defense that was presented at sentencing—"Brown's dysfunctional family life; history of substance abuse, depression and anxiety, and Attention Hyperactivity Disorder (ADHD); childhood sexual abuse at the hands of his stepbrother; and physical and emotional abuse caused by his stepfather," ECF-1 53 at 10—stands as a compelling catalogue that Brown's attorneys should have delivered to an expert for consultation.

At the state habeas hearing, Brown's lead defense counsel, Toby Wilkinson, unwittingly testified to his own miscomprehension of what indicates potential "psychological problems," as he put it. ROA 15717. He knew, among other things, that his client had been hospitalized after a suicide attempt, but he put his own uninformed opinion about that sign of mental illness where a search for a psychological expert ought to have been:

> Q. Why did you not hire a consulting expert to evaluate Micah Brown, one that was not hired to testify, to conduct psychological testing on Micah Brown?
>
> A. Because everybody we talked to from the very beginning – every family member, every friend, Micah himself – told us he never ever, ever had any psychological problems.
>
> [Talking over each other.]
>
> Q. You know that he was psychiatrically committed for suicidality, right? He tried to kill himself, right?
>
> A. Okay. Yes ma'am.
>
> Q. You know that, don't you?
>
> A. I believe so.
>
> Q. Okay. And you had his psychiatric commitment records, right?
>
> A. They didn't show anything other than suicide to the best of my knowledge.

Q. You presented testimony about severe depression –

A. Right.

Q. -- right? Records made reference to severe depression, right?

A. Right. You can be depressed and not have a psychological problem, ma'am.

ROA 15717-18.

Wilkinson unknowingly exposed his own deficient understanding of mental illness. His testimony shows that this Court misapprehended the facts of this claim when it stated that "[e]xcluding [the] alleged conversation between the mitigation specialist and state trial counsel, insufficient evidence exists for us to conclude that reasonable jurists would debate whether trial counsel fell below the *Strickland* standard in investigating whether Brown had ASD." ECF 53-1 at 7. Insofar as the gravamen of the claim is counsel unreasonably failed to seek an expert evaluation that would have discovered Brown's ASD, there is much more evidence to support that claim than a single, unrecorded conversation. At the same time, Wilkinson's dismissive assessment of the psychiatric hospital's records as not showing "anything other than suicide" belongs in its own class of "indolence or incompetence." *Anderson*, 338 F.3d at 393. There is much more evidence of ineffectiveness than just Wilkinson's

apathetic and ignorant testimony, but that testimony is worth highlighting as a totem of just how poorly represented Brown was when it came to a proper inquiry into his social and psychological background.

Finally, this Court misapprehended the (in)sufficiency of trial counsel's reliance on interviews with Brown's family and friends as dispositive of an adequate performance under *Strickland*. As Wilkinson effectively admitted at the state habeas hearing, he had records showing that Brown's family and friends were completely wrong in suggesting Brown had "never ever, ever had any psychological problems." ROA 15717. Whatever reasons Brown's family and friends may have had for misstating the truth of his history of mental illness, his counsel has no excuse under *Strickland* and its progeny for accepting their lay diagnoses as the last word on the subject. Their lay anecdotes did not obviate the need for expert consultation when Brown's lawyers held psychiatric records of severe mental illness right in their hands. "The scope of their investigation was unreasonable in light of what counsel actually discovered in the records" that Brown had been hospitalized for suicidality, addiction, and severe depression. *Wiggins*, 539 U.S. at 525. "[A]ny reasonably competent attorney would have realized that pursuing

these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should grant the motion for reconsideration and issue a certificate of appealability on Claim 1.

Respectfully submitted,

MAUREEN FRANCO
Federal Public Defender
Western District of Texas

*/s/ Benjamin H. McGee, III*
BENJAMIN H. MCGEE, III
Assistant Federal Public Defender
TIVON SCHARDL
Chief, Capital Habeas Unit
919 Congress Ave., Suite 950
Austin, Texas 78701
(737) 207-3020
Humphreys_McGee@fd.org

*Counsel for Appellant*

DATED: November 8, 2024

## CERTIFICATES OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS

I do hereby certify that on November 8, 2024, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon all registered users and counsel of record for Respondent-Appellee.

Counsel further certifies that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Benjamin H. McGee, III*
Benjamin H. McGee, III
Counsel for Appellant

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPLE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because this brief contains 2,158 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

/s/ *Benjamin H. McGee, III*
Benjamin H. McGee, III
Counsel for Appellant

DATED: November 8, 2024

# APPENDIX

# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-70004

---

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2024

Lyle W. Cayce
Clerk

Micah Brown,

*Petitioner—Appellant,*

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division,*

*Respondent—Appellee.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-2301

---

UNPUBLISHED ORDER

Before Jones, Higginson, and Ho, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

A Texas jury convicted Micah Brown of murder and sentenced him to death. After direct appeal and collateral review in state court, Brown filed his application for a writ of habeas corpus in federal court. The district court denied relief and a certificate of appealability (COA). Brown now asks the court for a COA on three claims. Concluding that reasonable jurists could not

No. 23-70004

disagree as to the resolution of these claims by the district court, we deny the COA.

I.

Micah Brown murdered his ex-wife Stella Ray on July 20, 2011, in Greenville, Texas.[1] Brown and Ray shared two young children. Ray was planning to move with their children to a different town to start a new job. In the days preceding the murder, several violent altercations occurred between Brown, Ray, their children, and Ray's other ex-husband Tracy Williams. In one altercation about a week before the murder, Williams allegedly choked Brown in front of Brown and Ray's children. On July 16, Brown told Ray he was suicidal, causing Ray to ask the police to check on Brown. During this welfare check, the police discovered and seized an illegal weapon—a sawed-off shotgun—and ammunition and arrested Brown. Brown was released the next day.

On July 19, Brown allegedly punched his wife and one of his children in the face, leading Ray to file a family violence report with the police. The next day, Brown returned to Ray's home. Finding no one home, Brown stole a shotgun belonging to Ray's son, marijuana, and a camera that contained photographs of Ray's bruised face taken after the previous physical altercation with Brown. Brown returned to his home, where he sawed off the stolen shotgun and loaded it with bullets he used for hunting. After seeing Ray drive past his residence later that evening, Brown got into his own vehicle and pursued Ray, attempting to catch her attention. Noticing Brown following her,

---

[1] The facts surrounding Ray's murder and the events preceding it are taken from the Texas Court of Criminal Appeal's opinion affirming Brown's conviction and death sentence on direct appeal. *Brown v. State*, No. AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015).

Ray called 911 and informed the dispatcher that Brown was pursing her, that she previously filed complaints against Brown, and that she feared Brown might ram his vehicle into hers. Ray pulled over, and according to the 911 call, she told Brown that she was on the phone with the police.

When a police officer responding to Ray's 911 call pulled up behind their stopped vehicles, Brown pointed the shotgun at Ray's head and shot her. The fatal shooting was captured on the police vehicle's dashcam. Brown immediately fled in his vehicle while the responding police officers attempted to help Ray. Ray's two children were in the back of her vehicle. Brown was arrested the next day without incident. While at the local jail, Brown agreed to a televised interview, during which he admitted to murdering Ray, claiming Ray threatened his relationship with his children and blaming Ray for his arrest for possessing an illegal shotgun, which prevented him from hunting. Brown also stated he thought Ray was on the phone with the police when he killed her.

Brown was charged with capital murder, pursuant to Texas Penal Code § 19.03(a)(2), which allowed the jury to convict Brown if they found he "intentionally" murdered Ray "in the course of committing or attempting to commit . . . obstruction or retaliation," or "terroristic threat." The jury convicted Brown of capital murder and sentenced him to death in May 2013. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. *Brown v. State*, No. AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015).

While that appeal was pending, Brown filed for a writ of habeas corpus in state court. Following a week-long evidentiary hearing in July 2018, the state habeas court issued its fifty-five page findings of fact, conclusions of law, and recommendation that relief should be denied. *Ex parte Brown*, No. 27,742 (354th Jud. Dist. Ct. Nov. 5, 2018). The Texas Court of Criminal Appeals

No. 23-70004

(CCA) adopted the recommendation and denied state habeas relief in September 2019. *Ex parte Brown*, No. WR-85,341-01, 2019 WL 4317041 (Tex. Crim. App. Sept. 11, 2019).

In September 2020, Brown filed a federal application for a writ of habeas corpus in the United States District Court for the Northern District of Texas, in which he asserted eleven claims for relief. In August 2021, Brown filed a motion for a *Rhines*[2] stay and abeyance of the federal proceedings to pursue his Fifth Amendment claim, which the district court denied in February 2022. In June 2022, Brown sought to amend his petition. Two months later, a magistrate judge recommended the district court deny Brown's habeas petition, request for an evidentiary hearing, motion for leave to amend, and COA. Brown objected. The district court overruled Brown's objections, adopted the magistrate judge's findings and conclusions of law, and denied habeas relief and a COA (as well as the motion for an evidentiary hearing and motion for leave to amend).

Brown seeks a COA on three claims: (1) ineffective assistance of trial counsel for failure to investigate and present evidence of Brown's Autism Spectrum Disorder (ASD) during the guilt/innocence stage in violation of the Sixth Amendment; (2) ineffective assistance of trial counsel for failure to investigate and present a complete mitigation case, including evidence of Brown's ASD, during the punishment stage in violation of the Sixth Amendment; and (3) the prosecutor's statements during the sentencing stage of trial that the jury should not show mercy to Brown unless he asked for it, in violation of Brown's Fifth Amendment right not to testify at sentencing.

II.

_____

[2] *Rhines v. Weber*, 544 U.S. 269 (2005).

No. 23-70004

To obtain a COA, Brown must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). He must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Additionally, the Supreme Court has held that, "when the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

Federal courts must generally defer to state courts' factual determinations "unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Federal habeas courts must also defer to state court determinations of law unless the state court decision "was contrary to, or involved an unreasonable application of" clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1).

III.

We address Brown's asserted bases for a COA in turn.

A.

Brown first seeks a COA on whether his trial counsel performed deficiently during the guilt/innocence stage of trial by failing to investigate and

present evidence that Brown has ASD.[3] Brown argues that the ASD evidence would have supported his argument that he did not kill Ray to retaliate against her or to obstruct the family violence investigation or the contemporaneous 911 phone call—the basis of the *capital* murder charge—but that he instead killed Ray in anger because Ray was planning to move away with their children. Brown asserts that the ASD evidence would have helped jurors understand why Brown fixated on his belief that Ray was threatening his relationship with his children and would explain his behavior (i.e., the television interview and letter to his cellmate)[4] and courtroom demeanor, which appeared remorseless. Brown contends that, if presented with the evidence, the jury "likely would have" acquitted Brown of capital murder.

To support this ineffectiveness-of-counsel claim, Brown largely relies on the testimony of Maureen Griffin, the mitigation specialist retained by the Brown trial defense team. In her 2015 affidavit attached to Brown's initial application for habeas relief filed in state court, Ms. Griffin affirmed that "[b]ecause the testing of clients is common practice, I recommended to [trial counsel] that [Brown] be examined for mental health and neuropsychological issues." While her affidavit states that Ms. Griffin observed a "flat affect" and was under the "impression" that Brown had Asperger's Syndrome,[5] the affidavit does not state that she relayed these specific concerns to trial

---

[3] The state habeas trial court found that Brown failed to establish that he has ASD. Because we conclude that trial's counsel's representation in this context did not fall below the *Strickland* standard regardless of whether that subsequent ASD diagnosis was accurate, we need not wade into that debate.

[4] In a letter to his cellmate, Brown wrote that he did not regret killing Ray and would do the same to Williams, Ray's other ex-husband, if given the opportunity. *Brown*, 2015 WL 5453765, at *5–6.

[5] The Diagnostic and Statistical Manual of Mental Health Disorders no longer recognizes Asperger's Syndrome as a distinct diagnosis, and Asperger's Syndrome was incorporated into a broader umbrella term of autism spectrum disorders.

No. 23-70004

counsel. However, during the week-long state habeas trial in July 2018, Ms. Griffin testified that she informed one of the trial counsel that she suspected Brown had Asperger's Syndrome. Both of Brown's trial counsel denied that conversation ever occurred. The state habeas court credited Brown's trial counsel's testimony over Ms. Griffin's testimony when it denied habeas relief. As factual findings and credibility determinations by a state habeas court are entitled to a presumption of correctness unless rebutted by clear and convincing evidence, 28 USC § 2254(e)(1); *see Miller v. Thaler*, 714 F.3d 897, 901 (5th Cir. 2013), which Brown has not presented, we defer to the trial court's determination here.

Because the district court conducted a de novo review of this *Strickland*[6] claim and denied it on the merits,[7] we are tasked with deciding only whether reasonable jurists could disagree with the district court's resolution. Excluding this alleged conversation between the mitigation specialist and state trial counsel, insufficient evidence exists for us to conclude that reasonable jurists would debate whether trial counsel fell below the *Strickland* standard in investigating whether Brown had ASD. During the state habeas hearing, trial counsel testified that none of the eighty-plus people the defense team spoke with, including Brown, his family, and friends, ever noted any history of psychological issues, which would have prompted counsel to investigate further, nor did they observe any behavior that made them believe he may have had a mental health disorder. And, while Dr. Cunningham was retained as mitigation witness and testified during the punishment stage, no

---

[6] *Strickland v. Washington*, 466 U.S. 668 (1984).

[7] The district court noted, and Brown concedes, that Brown did not raise this "portion" of the ineffectiveness-of-counsel claim in his state habeas petition. Rather than rule definitively on whether Brown failed to exhaust, the district court, out of an abundance of caution, conducted a de novo review of the merits of the claim.

evidence has been presented to us that he suspected ASD or that he recommended psychological or other type of testing.

Because we conclude that reasonable jurists would not debate the district court's determination that trial counsel did not perform deficiently in failing to identify Brown's subsequent (contested) ASD diagnosis and present evidence of such diagnosis to the jury,[8] we do not reach prejudice or whether Brown's claim is procedurally defaulted.

## B.

Brown also asserts that trial counsel was ineffective during the punishment phase of trial by failing to investigate and present a full case in mitigation, including a failure to discover that Brown had "mild" ASD and present evidence on it. Because Brown raised this claim in state court and the CCA rejected that claim on the merits, AEDPA deference applies. In addition to overcoming AEDPA deference, under which the state court's application of Supreme Court precedent must be "unreasonable," *Harrington v. Richter*, 562 U.S. 86, 101 (2011), Brown must show "(1) that his trial counsel rendered deficient performance, and (2) that the deficient performance resulted in actual prejudice," *King v. Davis*, 883 F.3d 577, 586 (5th Cir. 2018). Brown must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the mitigation context in a death-

---

[8] Because we must credit trial counsel's testimony that Ms. Griffin never shared her suspicions regarding ASD with them and that they were unaware that Brown had mannerisms consistent with ASD and we conclude that trial counsel's performance during the guilt/innocence stage of trial did not fall below the *Strickland* standard, we need not reach the district court's determination that any evidence of Brown's ASD would have been inadmissible under Texas law.

penalty case, we must assess the reasonable probability that the jury would have not sentenced Brown to death.

The two questions submitted to the jury at the punishment stage were (1) whether "beyond a reasonable doubt that there is a probability that [Brown] would commit criminal acts of violence that would constitute a continuing threat to society," and (2) whether "[t]aking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than death sentence be imposed." Jury Verdict, Doc. No. 52-16, pp. 141-42, *Brown v. Davis*, No. 3:19-cv-2301 (N.D. Texas). The jury found in the affirmative on both. *Id.*

Following its week-long evidentiary hearing, the state habeas court concluded that trial counsel's performance during the mitigation stage was not deficient because they presented a "thorough" mitigation case. The state habeas court reasoned that the additional mitigation evidence Brown argued should have been presented to the jury "concerning [Brown's] family history, family dysfunction, relationships, drug abuse, and other difficulties" was "largely cumulative" of the other evidence presented at trial. The CCA adopted these findings and conclusions of law. *Ex parte Brown*, 2019 WL 4317041, at *1.

The district court, in adopting the magistrate judge's Findings, Conclusions, and Recommendation, determined the CCA reasonably concluded that the Brown defense team's mitigation investigation and presentation did not fall below an objective level of reasonableness. In its Recommendation, the magistrate judge emphasized the scope of the investigation by summarizing the mitigation defense presented at trial, which included testimony from Brown's biological parents, sister, and friends; two mental health experts; a

minister and counselor who met with Brown during his incarceration; and jail staff. Testimony from family and mental health professionals related to Brown's dysfunctional family life; history of substance abuse, depression, anxiety, and Attention Hyperactivity Disorder (ADHD); childhood sexual abuse at the hands of his stepbrother; and physical and emotional abuse caused by his stepfather. As to future dangerousness, the counselor who met with Brown in jail testified that Brown had experienced a religious conversion, while the minister who counseled him in jail testified Brown was respectful and remorseful. Jail staff testified that Brown had not caused any problems while in detention.

Brown argues that trial counsel's mitigation investigation and presentation were deficient because, inter alia, counsel did not ask Brown's family members about the intense level of trauma Brown experienced, failed to demonstrate the depths of Brown's drug addiction, and did not present testimony about Brown's then-undiagnosed ASD.

No one disputes that Brown had never been diagnosed with ASD prior to his conviction and sentence. Brown argues that the mitigation expert's suggestion to trial counsel that Brown may have Asperger's Syndrome, paired with Brown's comment that he "can't show emotion well" and statements made by Brown that made him appear remorseless, should have triggered trial counsel to investigate further.

As mentioned above, the state habeas trial court, whose findings were adopted by the CCA and to which we owe deference, found Ms. Griffin's testimony that she told trial counsel that Brown may have Asperger's Syndrome not credible.

Applying the double deference required by AEDPA and crediting trial counsels' testimony, we cannot say that the CCA's determination that trial counsel's mitigation investigation and presentation did not fall below the

No. 23-70004

*Strickland* standard is unreasonable. As a result, reasonable jurists could not debate the district court's denial of counsel's claimed ineffectiveness, and we need not examine prejudice.

## C.

Last, Brown seeks a COA on his prosecutorial misconduct claim, arguing that reasonable jurists would debate whether the state trial prosecutor violated Brown's Fifth Amendment rights by allegedly commenting on Brown's decision not to testify during the punishment stage of trial. Brown had testified during the guilt/innocence stage of the trial.[9] Embedded in this claim is Brown's motion for a *Rhines* stay to exhaust this claim in state court. Because of the lack of clarity as to whether Brown is seeking a COA on both the district court's denial of this claim on the merits and as to the denial of his motion for a *Rhines* stay, we address both out of an abundance of caution.

### 1.

The Fifth Amendment forbids prosecutors from commenting—directly or indirectly—on a criminal defendant's choice not to testify. *United States v. Bohuchot*, 625 F.3d 892, 901 (5th Cir. 2010). The test for determining whether a prosecutor's remarks constitute a constitutional violation is "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Rhoades v. Davis*, 852 F.3d 422, 432–33 (5th Cir. 2017) (quoting *Bohuchot*, 625 F.3d at 901)).

---

[9] Brown's decision to testify during the guilt/innocence stage of trial did not constitute a waiver of his Fifth Amendment privilege during the sentencing stage of trial. *See Mitchell v. United States*, 526 U.S. 314, 316-17 (1999).

No. 23-70004

Brown contends that the following remarks made by the prosecutor during closing arguments impermissibly referenced Brown's decision not to testify during the sentencing phase of trial:

> [M]ercy is given by God to those who show true repentance. Right? True repentance. Full unadulterated, unmitigated responsibility. I did it. It's my fault. I'm not blaming my family. I'm not blaming the victim. I'm not blaming society. I'm not blaming drugs. I did it. Please forgive me. Show me mercy, Lord. That's how mercy is given. That's how repentance occurs.
>
> Have you seen that from this Defendant? Absolutely not. So give him what he's asking for. That's what they want you to do when you go back in there to make your decision. Think about that.
>
> . . . .
>
> Who do we give life without parole to in a capital murder case? A defendant who throws himself at the mercy of the jury.
>
> . . . .
>
> A defendant who throws himself on his face in front of the jury and said I did it all, forgive me. It's my fault.
>
> . . . .
>
> [Y]ou don't give mercy to someone who hasn't asked for it, who hasn't asked for redemption, who hasn't admitted everything they've done. But you know what you give them? You give them justice under this law, man's law, your law.

a.

As to the first prong—whether the prosecutor's manifest intent was to comment on the defendant's choice not to testify—if there exists an "equally plausible explanation for the remark," the prosecutor's intent is not

No. 23-70004

manifest. *United States v. Davis*, 609 F.3d 663, 685 (5th Cir. 2010) (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996)).

Both the State and the district court point to other plausible explanations for the prosecutor's remarks. Most persuasively, the prosecutor may have been referencing Brown's apparent lack of remorse for murdering his ex-wife as demonstrated by the following trial evidence: (1) Brown testified during the guilt/innocence stage that Ray was responsible for her own death because she threatened to take their children away; (2) Brown told a reporter that he did not regret killing Ray, but regretted that he killed her in front of his children; and (3) Brown phoned Ray's mother after he killed Ray to inform her. The prosecutor may also have been referencing the testimony of mitigation witnesses, such as family members who referenced the abuse Brown suffered at the hands of his stepfather and stepbrother or the mental health professionals who testified regarding the effect of Brown's drug dependency and the corrupting effect of the violent community in which he was raised.

Because equal, if not more, plausible explanations for the prosecutor's closing remarks exist, reasonable jurists could not conclude that the prosecutor's manifest intent was to focus on Brown's decision not to testify during the sentencing phase of the trial.

b.

As our court explained in *United States v. Davis*, in determining "whether a jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, 'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so.'" 609 F.3d at 685 (quoting *Grosz*, 76 F.3d at 1326). Therefore, in the context of this COA, we are tasked with asking if reasonable jurists would debate whether the only way

No. 23-70004

to construe the prosecutor's remarks were as a commentary on Brown's choice not to testify at sentencing. For the same reasons the prosecutor's remarks do not reflect the required manifest intent, the answer to this question is no. The jury could have construed the prosecutor's remarks as referencing Brown's apparent lack of remorse or the testimony of Brown's mitigation witnesses.

\* \* \*

Because we find that the Fifth Amendment claim lacks merit, we do not consider whether the claim could have survived procedural default.

### 2.

Brown argues the district court abused its discretion when it denied Brown's motion for a *Rhines* stay to exhaust his Fifth Amendment claim. *See Young v. Stephens*, 795 F.3d 484, 495 (5th Cir. 2015). A district court abuses its discretion in denying a *Rhines* stay only if (1) there was good cause for failing to exhaust the claim in state court, (2) the claim is potentially meritorious, and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines v. Weber*, 544 U.S. 269, 278 (2005). Because we have just concluded that Brown's prosecutorial misconduct claim is not meritorious, we need not reach the other two prongs. The district court did not abuse its discretion in denying the motion for a *Rhines* stay.

\* \* \*

For these reasons, we deny Brown's motion for a COA on all claims.

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 18, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 23-70004   Brown v. Lumpkin
                 USDC No. 3:19-CV-2301


Enclosed is an order entered in this case.


             Sincerely,

             LYLE W. CAYCE, Clerk

             By: _____
             Monica R. Washington, Deputy Clerk
             504-310-7705

Ms. Donna F. Coltharp
Ms. Molly Knowles
Mr. Benjamin Humphreys McGee III
Mr. Ali Mustapha Nasser